## Case No. 11,089.

PHILADELPHIA & R. R. CO. v. MORRISON et al.

[21 Leg. Int. 372;[1] 5 Phila. 515; 6 Leg. & Ins. Rep. 178; 12 Pittsb. Leg. J. 186.]

Circuit Court, E. D. Pennsylvania. Nov., 1864.

LEGAL TENDER—SATISFACTION OF GROUND RENTS—ACT OF FEB. 25, 1862.

The principal of a ground rent is not a debt within the meaning of the act of congress, 25th February, 1862 [12 Stat. 345].

This was a bill to compel the defendants [Charles Morrison and others] to extinguish ground rents on receipt of the principal monies in United States notes. The constitutionality of the law, and its application to this case were the points raised. The first was not decided.

Before GRIER, Circuit Justice, and CADWALADER, District Judge.

CADWALADER, District Judge. The act of congress of 25th February, 1862, authorizing an issue, on the credit of the United States, of notes to a certain amount payable to bearer at the treasury, enacts that they shall be lawful money and a legal tender in payment of all debts, public and private,

[1] [Reprinted from 21 Leg. Int. 372, by permission.]

within the United States, except as is therein provided. The first question is whether congress can constitutionally compel the receipt of such paper as money in private transactions. The second question is whether the enactment, if constitutional, applies to such extinguishment money of a ground rent as is the subject of this proceeding. On the second point I do not intend to express an opinion. I own some ground rents; and although not, therefore, disqualified from sitting in the cause, may, perhaps, on this point, be less disinterested than the circuit judge. We seem to differ at present in opinion upon the first point, though there has not, as yet, been a full interchange of our views upon it. The organization of the court enables either judge sitting alone to adjudicate a case. I will, therefore, in order to enable the circuit judge to decide this case on the second point, withdraw from the bench. Before doing so, however, as he has made some remarks upon the first point, I will state my opinion upon it with my reasons. The money in a country is composed of its own coins and of those imported coins of which its laws permit the circulation, either at their actual value or at a prescribed exchangeable value. A nation's coins are portable metallic substances in pieces whose composition, weight, impression and exchangeable value are ascertained by law. The purpose of their coinage is to impart a standard value to them. Through this they constitute money, properly so called. They have an actual value which, as tested by foreign exchanges, approximates their prescribed value, or differs from it, according to their pureness or alloy. Motives of national policy, and considerations of national self-respect tend to check, if they do not altogether prevent, such abuses of sovereign power as would regulate the latter value arbitrarily.

The notes in question may be designated as bills of credit of the United States. They might, for some purposes perhaps, be called paper money of the national government. But they represent money only as they circulate upon the credit which may be given to the national faith pledged for their payment. Paper money, so called, has, in itself, no value measurable with reference to any standard of material or weight. The unqualified use of the phrase "paper money," therefore, never can be accurate. It is, in its occasional use, which results, perhaps, from the infirmity of language, applied, in a restricted sense, to those negotiable public or private securities, which, as representatives of money, pass by delivery from hand to hand. But negotiable securities for money, though national faith is pledged for its payment, are not, in the language of constitutional law or of general public law, in the language of the jurisprudence of continental Europe or of the common law of England, or in the language of commerce, actual money. It is true that negotiable paper securities, public or private,

which circulate, whether at a discount or not, resemble money in respect of their circulation. The resemblance, in this respect, is in proportion to the facility of their exchangeableness, and in the inverse proportion of any discount at which they may pass. But such resemblance ought not to be considered as independent of the available resources for their payment in coin or its equivalent. The resemblance, though they should even be readily exchangeable at their full nominal value in money, cannot make them specifically money. They have not, like the coins, a corporeal value independent of that which is inscribed on them. The similarity, therefore, does not justify their designation as money. Counsel, in arguing that paper securities may be money, have cited remarks of Lord Mansfield and some other judges, who, in administering the common law on commercial principles, have had occasion to decide questions upon transfers of title in bank notes by delivery. The same principles have, as rules of decision, been applied in like manner to questions upon the transfer of exchequer bills or treasury notes and other negotiable public securities, and also to bills of exchange and promissory notes of private associations and of individuals. Such paper may sometimes for purposes relative to transfers of title to it, and perhaps for some other qualified purposes, be called money. Lord Mansfield, with such a relation of his words, did say that bank notes are as much money as the current coin used in common payments. But he had, in the context, said that they are treated as money—as cash—in the ordinary course and transaction of business, by the general sense of mankind which gives them the credit and currency of money to all intents and purposes. He did not consider them as money to any other intents or purposes than those of credit and currency which he thus mentioned. For all purposes of this kind they may have their exchangeable value. But it cannot be an intrinsic material exchangeable value like that of actual money. Therefore, when stricter legal precision of language was afterwards thought necessary, the notes, bills or drafts which were the subjects of such decisions were judicially called "representatives of money." 4 Barn. & Adol. 6, 9. This was a more accurate form of expression. If, in deciding a case like the present, incidental remarks of English judges in discussing such ordinary questions of civil jurisprudence, must be thus considered, the adoption by Coke and Blackstone of the maxim nullum simile est idem should perhaps not be forgotten. The use of the phrase "paper money" can, however, derive no proper sanction from English authorities. An action for money had and received cannot be maintained in England, by an owner of bank notes to recover their value from a wrongful holder of them "unless money has been received for them," or they have been treated, between the parties, "as money." On the same question,

whether bank notes are dealt with as money, the familiar case of a tender in them depends. If they are objected to, it is a bad tender, though otherwise it is a sufficient one. The British statute of 29th August, 1833, renewing the incorporation of the Bank of England, made its notes a legal tender so long as it should continue to pay them on demand in legal coin, but not even thus a legal tender by the bank itself or any of its branches.

The qualification thus implied in the use of the phrase "paper money" is more important as to national than as to private negotiable securities. For default as to the latter there may be judicial redress. But if the former should not be paid from the treasury, the nation or its government cannot be sued. This difference was judicially considered in ascertaining the extent of the constitutional prohibition of the issue of bills of credit by the states. The result of the decisions is that the prohibition applies only to negotiable paper so issued upon the credit of a state that there is no other debtor. The notes of a bank incorporated by a state, with no other stockholder than the state, and no capital stock except the proceeds of sale of bonds of the state, and managed wholly by directors elected by the legislature of the state, are not within the prohibition, because the bank may be sued, and its property taken in execution under a judgment. In one of the cases the credit of the state was pledged for the ultimate redemption of the notes of such a bank, and the state could, under a law in force, be sued. But these distinctions were disregarded, because the promise to pay the notes was primarily that of the bank, and because the law authorizing suits against the state might be repealed at pleasure, and moreover if a judgment could be obtained, payment of it was not enforceable by execution against the state. The supreme court thought the notes of this bank altogether different from bills of credit; saying, "A bill of credit emanates from the sovereignty of the state. It rests for its currency on the faith of the state pledged by a public law. The state cannot be sued ordinarily on such a bill, nor payment exacted against its will. There is no fund or property which the holder of the bill can reach by judicial process." [Darrington v. Bank of Alabama] 13 How. [54 U. S.] 17. See [Briscoe v. Bank of Commonwealth of Kentucky] 11 Pet. [36 U. S.] 313, 314; [Woodruff v. Trapnall] 10 How. [51 U. S.] 205; [Curran v. State of Arkansas] 15 How. [56 U. S.] 317, 318.

The qualified partial resemblance of the notes in question to money would be increased to the utmost extent possible by an effective law compelling the receipt of them as money for all purposes whatsoever. But such a law, if it could be constitutionally enacted, would not make them actual money. The bills of credit emitted by the United States during the War of Independence, declared the bearer entitled to receive Spanish milled dollars, or their value in gold or silver. The congress de-

clared that whoever should refuse to receive the bills in exchange for any property as gold and silver, should be deemed an enemy, and that the paper ought to be a tender in payment of all private and public debts. The congress, though it did not claim the power to enforce these declarations, recommended the enactment of tender laws by the states for the purpose; and, in the early part of the war, this recommendation was carried into effect by the states as far as its purposes could be effectuated by legislation. The articles of confederation usually designated as of the year 1778 were written in 1777. They contained a provision pledging the faith of the United States for the payment of the bills of credit. These articles did not go into operation till the year 1781. The bills of credit were, in the meantime, so depreciated that, as Judge Story says, "In the course of the year 1780, they" had "quietly died in the hands of their possessors." The states, had, in March, 1780, been required to bring in the bills of credit at forty dollars for one silver dollar; and congress had, "in the most pressing manner," recommended to the state legislatures the repeal of "all laws making the paper bills of the United States a legal tender, equal to gold and silver." See Resolutions of Congress; 3 Story, Const. c. 33; Preamble Act of Pennsylvania, 21 June, 1781 [2 Smith's Laws, 1]. The present constitution provided that all debts contracted and engagements entered into before its adoption should be as valid against the United States under it as under the confederation. The paper money to the amount of between seventy-eight and eighty millions of dollars was supposed to be outstanding at the adoption of the constitution; but two millions of dollars only was the estimated amount requireable in order to cover this liability of the United States. An act of the first congress under the constitution, for the liquidation of the public debt by certificates of a new loan, according to the specie value, provided for such liquidation of these bills of credit at the rate of one hundred dollars for one dollar in specie. Act Aug. 4, 1790, § 3 [1 Stat. 139]. Thus, said Judge Story, was a paper currency which had been declared "equal to gold and silver, suffered to perish in the hands of persons compelled to take it; and the very enormity of the wrong made the ground of the abandonment of every attempt to redress it." He added that "some apology, if not some justification," might "be found in the eventful transactions and sufferings of those times," but that "the history of paper money, without any adequate funds pledged to redeem it, and resting merely upon the pledge of the national faith has been, in all ages, and in all nations, the same;" and that "it has constantly become more and more depreciated; and, in some instances, has ceased, from this cause, to have any circulation whatsoever, whether issued by the irresistible edict of a despot, or by the more alluring order of a republican congress." The qualification implied in such uses of the phrase "paper money" requires no further explanation.

A law compelling the receipt of national bills of credit as money in payment of debts, would not give to them the greatest possible resemblance to money, because there are other uses of money. This case has, however, been argued as if the first point was whether the receipt of the notes in question in payment of debts can be compelled, or, in more constitutional phraseology, whether congress can make them a legal tender for this purpose. I will, therefore, consider the question whether congress has the constitutional power to make such paper a legal tender in payment of debts. A negative answer must of course exclude all implication of the more extended power. The constitution confers upon congress power to borrow money on the credit of the United States, to coin money, regulate its value and that of foreign coin, and fix the standard of weights and measures; and prohibits the states from coining money, emitting bills of credit, or making anything but gold and silver coin a tender in payment of debts. Of the powers thus taken away from the states, the only one expressly conferred upon the national government is that of coining money. There is no direct grant of any power to make bills of credit of the United States a tender in payment of debts; and the omission must have been intentional. But the constitution expressly authorizes congress to make all laws necessary and proper for carrying into execution the legislative and other powers of government which are granted. The decision of the present question depends upon the extent and application of this incidental power of legislation. In ascertaining its extent, the language conferring it has been judicially contrasted with that of a prohibitory constitutional provision, which is not here important otherwise than as it contains the phrase "absolutely necessary for executing" certain laws of the states. From this use of the word "absolutely" in the latter clause of the constitution, and the omission of such qualification of the word "necessary," in the clause conferring the former incidental power of legislation, the conclusion deduced has been that this incidental power enables congress to enact not only laws absolutely necessary, but likewise any laws, not inappropriate, which may be relatively necessary, as means of executing the powers directly granted. But this does not authorize an assumption, through such legislation, of any distinct and independent power,—or of any specific incidental power which, had the intention to grant it existed, would have been expressly mentioned. In determining the application of the incidental power of legislation, the ninth and tenth amendments of the constitution must be considered. The ninth provides that the enumeration in the constitution of certain rights shall not be construed to deny or disparage others retained

by the people; the tenth provides that the powers not delegated by the constitution, to the United States, nor prohibited by it to the states, are reserved to the states respectively or to the people. These two amendments, whether their words are to be understood as restrictive or declaratory, preclude everything like attribution of implied residuary powers of sovereignty, or ulterior inherent rights of nationality, to the government of the United States. Therefore the constitution confers no legislative powers except those directly granted, and those which may be appropriate as incidental means of executing them.

As a means of executing the constitutional power to borrow money on the credit of the United States, a security declaring the national faith pledged for the amount of money, or credit, received, is, however, proper, and is, relatively speaking, necessary. Congress may regulate the form of the securities. They may be negotiable notes of the United States; and such notes may be called bills of credit. That they are so called, that the constitution does not expressly authorize their emission by that name, and that it prohibits the emission of such paper in any form by a state, cannot preclude their issue by the United States for this purpose of pledging the national faith. The notes in question are therefore lawfully issued, and may lawfully circulate. Congress can, of course, regulate the exchangeable value of such paper in transactions of many kinds of, with, or under, the national government itself; and may make it receivable as money in such transactions. The notes may be thus accredited so as to circulate, with no compulsion, as money, in ordinary times at no discount, in transactions of private business. But in times of national trouble, and consequent fiscal embarrassment, this cannot be, with reason, expected. The treasury notes issued by the United States under congressional authorization did not, in the years 1814 and 1815, circulate except at discounts which were variable and sometimes great. The country was then at war. There was a hostile blockade of the sea coast with occasional invasions on land. The banks of the states were insolvent, that is to say, had suspended payments in coin. But they refused to receive the treasury notes as money. These notes were, as Judge Story says, depreciated before the peace to about half of their nominal value. The British exchequer bills of those days, which were negotiable by delivery, and were "to be current and pass in any of the public revenues, aids, taxes or supplies, or at the receipt of" the treasury, did not, even after the general pacification, circulate without great variations in the rates of their market values.

The present question of compelling the receipt of the notes as money at their nominal amount in transactions in which the government issuing them has no concern, is of course different. This question cannot be stated accurately without a previous inquiry whether a law authorizing their original issue is an appropriate means of executing any constitutional power other than that of borrowing on the national credit, to which their emission has been hitherto referred. This power is the only constitutional authority for emitting them. In the distribution of powers of national government, such an authority, if conferred, should be classed among those which concern fiscal subjects. Its primary purposes and relations are exclusively fiscal. Relations of the subjects of it may afterwards become commercial. But, if a general authority to regulate commerce within the United States had been conferred upon congress by the constitution, the authority would not have been understood to include such a power as incidental. The constitution has, however, conferred no such general authority. The authority conferred by it is only to regulate commerce with foreign nations, and among the several states, and with the Indian tribes. This, if we exclude commerce with Indian tribes, applies only to foreign and inter-state commerce, and not to internal commerce of the states. Foreign exchanges, of course, cannot be regulated by any law concerning the paper in question, or any paper securities whatever. Commerce with foreign nations would therefore have been out of the question, if the words of the act of congress had not limited, as they do, its application to debts within the United States. As to such debts, the act, if it could even be considered as a regulation of commerce, would have no specific or distinct applicability to commerce between states.

There can be no implication of a constitutional power enabling the United States to make their bills of credit a tender in payment of debts from the constitutional prohibition of the states to do so. The tenth amendment is, however, invoked in support of an argument that the constitutional powers of the national government should be deemed co-extensive with all powers of which the constitution prohibits the exercise by the several states. This amendment and the ninth have already been quoted. Nothing in the series of amendments which includes them can lend force to such an argument. They are not grants of power but restrictions of it; and neither powers nor enlargements of power can through implication result from them. Chief Justice Marshall, in reviewing their history, said: "The great revolution which established the constitution of the United States was not effected without immense opposition. Serious fears were extensively entertained that those powers which the patriot statesmen, who then watched over the interests of our country, deemed essential to union, and to the attainment of those invaluable objects for which union was sought, might be exercised

in a manner dangerous to liberty. In almost every convention by which the constitution was adopted, amendments to guard against the abuse of power were recommended. These amendments demanded security against the apprehended encroachments of the general government, not against those of the local governments." [Barron v. Mayor, etc., of Baltimore] 7 Pet. [32 U. S.] 250. See [Livingston v. Moore] Id. 551, 552; [Fox v. State of Ohio] 5 How. [46 U. S.] 434; [Withers v. Buckley] 20 How. [61 U. S.] 89–91. That the amendments were thus intended for security against usurpations of the national government only, and not against encroachments of the state governments, may be considered a truism. But recurrence to historical facts which explain constitutional truisms, cannot be too frequent, if they are in danger of being overlooked in calamitous times, or of being crowded out of memory by any succession of appalling events.

The power to borrow on the national credit being thus the sole source of authority to issue bills of credit, the question to be considered is whether a law to make them a legal tender is constitutional under that power. Here it may be proper to recur to the threefold constitutional prohibition of the states to coin money, emit bills of credit or make any thing but coin a tender, and the twofold constitutional omission, as to the United States, of express power to emit bills of credit or to make them a tender, though an express power to coin money is conferred. The prohibitions to the states do not impliedly preclude an exercise by the United States of so much of the prohibited powers as may be appropriate and incidental to powers directly conferred upon congress. Thus, we have seen that bills of credit may be issued in order to pledge the national faith for the payment of money borrowed, and that they may be made receivable as equivalents of money in business of the national government. But the prohibitions and omissions determine the meaning of the constitution so as preclude enlargements and extensions of these limited incidental powers to the character and magnitude of distinct independent powers. In these respects, moreover, the phraseology of the constitution shows, convincingly that power to make bills of credit, a tender would have been expressly conferred if it had been intended to authorize the national government to make them a tender in transactions not with itself.

When the constitution was framed, reasons for withholding the grant of such a distinct independent power pressed with saddening force in the organization of a government about to liquidate an immense existing debt of this kind, at the rate of one for forty, if not one for a hundred. The difficulties of inducing an adoption of the constitution probably could not have been overcome, if the state conventions to which it was submitted had understood it as conferring any such independent power. The twofold omission of express power to issue bills of credit or to make them a tender must, at all events, preclude an implication of either power as incidental to the other. Moreover, that each subject is mentioned in the constitution, prohibitorily, but not otherwise, cannot be overlooked when the existence or extent of any merely incidental power is to be considered. This being premised, what is the argument for the constitutionality of the enactment in question, under the power to borrow on the national credit? The only argument which can be conceived would outstretch the webs of constructive enlargement of the just proportions of the constitution. It would first be necessary to demonstrate that, if the constitution had contained an express or direct grant of power to emit bills of credit, congress would have had an incidental power to make them a tender. Whether this could have been established will not require consideration, because the constitution contains no such express grant of power to emit bills. Assuming this hypothetical position established, the next position would be that though the power to emit them is not expressly granted, yet, as it exists incidentally to that of borrowing on the national credit, the secondarily incidental power of making them a tender is included. If the constitutional prohibitions, and those omissions of grants of power which have been considered, were altogether disregarded, this argument could not prevail. If the conversion, by mere implication, of an incidental into a distinct independent power is inadmissible, such a reduplicated conversion by successive implications must be more objectionable.

I am, therefore, of opinion that the enactment is unconstitutional.

Judge CADWALADER having withdrawn from the court, the judgment was pronounced by Judge GRIER.

GRIER, Circuit Justice. Coined money, in modern times, forms but a very small portion of the current money used in commercial transactions. Paper money representing credit has long been used as current and lawful money. But no one could be compelled to accept the promise of a bank to pay money, instead of the coin itself. The notes of the Bank of the United States, issued under the authority of the government, were current money and lawful money, because issued by such authority, but were never made a legal tender for the payment of debts. A contract made in the United States for the payment of a certain number of dollars would be construed as meaning, not Prussian dollars or Spanish milled dollars, but lawful coin of the United States; the addition of the description "lawful money of the United States" is entirely superfluous and does not change the nature of the obligation.

The statutes of congress always make a distinction between lawful or current money and that which shall be a tender for payment of debts. Hence, we find that when such is the intention, the language is, "And shall be a legal tender," &c. Some coins of the government are a legal tender below a certain amount, but not beyond. Thus, by act of 9th February, 1793 [1 Stat. 299], after the expiration of three years all foreign coins except Spanish milled dollars shall cease to be a legal tender. By act of April, 1806 [2 Stat. 374], "foreign gold and silver coins shall pass current as money, within the United States," and be a legal tender for the payment of all debts, &c., at the several and respective rates following, &c. Again by act of 28th June, 1834 [4 Stat. 700], "The following gold coin shall pass as current money, and be receivable in all payments by weight at the following rates," &c.

Hence we find that in all cases where other money than the coinage of the United States is ordered to be received as current or lawful money, the statute carefully provides the rate and conditions under which they are made a legal tender for payment of debts. It is clear, therefore, that congress has always observed the distinction between current and lawful money, which may be received in payment of debts, if the creditor sees fit to accept it, and that which he may be compelled to accept as a legal tender. It is clear also that if congress make any other thing than their own coin a legal tender it may define the cases in which it may be used as such. Thus in the act authorizing the national banks, their notes are made a legal tender for certain debts due to the government for taxes, &c., but not for debts due from one citizen to another. The treasury notes are made lawful or current money, "and a legal tender for debts," &c., as between individuals. As this is the first act in which this high prerogative of sovereignty has been exercised, it should be construed strictly. It is doubtful in policy and dangerous as a precedent.

The only question then is whether this case comes within the letter of the statute. Is the money which may be paid to extinguish a ground rent within the category of the act? Is it a debt? The owner of the land is not bound to pay it. The owner of the rent cannot compel him to pay it. There is no obligation as between the parties. It cannot be converted into an obligation by the election of one of the parties without the consent of the other. A man may execute his bond to me voluntarily, but unless I accept it he does not become my debtor. These ground rents, in the nature of a rent service, are somewhat peculiar to Pennsylvania, and little known in other states. But the supreme court of the state has very clearly settled and determined their nature. The cases are too well known to the legal profession to need quotation. "A rent service (says the court in Bosler v. Kuhn, 8 Watts & S. 186) is not a debt, and a covenant to pay it is not a covenant to pay a debt. The annual payments spring into existence, and for the first time become debts, when they are demandable."

I am of opinion, therefore, that the tender offered by the bill in this case is not authorized by the statute, and that the respondents cannot be compelled to extinguish their estate in the land, by such a tender as that now made. The bill must therefore be dismissed.